JUDGE SCHEINDLIN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**11 CIV 9073**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, 100 F Street, N.E. Washington, DC 20549, | **COMPLAINT** |
| | 11-CV-_____ (   ) |
| Plaintiff, | **ECF CASE** |
| v. | **Jury Trial Demanded** |
| URIEL SHAREF, ULRICH BOCK, CARLOS SERGI, STEPHAN SIGNER, HERBERT STEFFEN, ANDRES TRUPPEL, and BERND REGENDANTZ, | |
| Defendants. | |



RECEIVED
DEC 1 9 2011
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff, United States Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.      This action involves a bribery scheme that took place over the course of more than a decade. From approximately 1996 until early 2007, senior executives at Siemens Aktiengesellschaft ("Siemens") and its regional company in Argentina, Siemens S.A. ("Siemens Argentina"), paid scores of millions of dollars in bribes intended for top government officials in Argentina, including two Presidents and Cabinet Ministers in two Presidential administrations.

2.      The bribes were initially paid to secure a $1 billion government contract (the "DNI Contract") to produce national identity cards, or *Documentos Nacionales de Identidad*, for every Argentine citizen.  After paying bribes to obtain it, Siemens was awarded the DNI Contract in 1998.  Later, after a change in Argentine political administrations resulted in the DNI Contract being suspended, and then canceled, Siemens paid additional bribes in a failed effort to bring the contract back into force.  Still later, after the company instituted an arbitration proceeding to recover its costs and expected profits from the canceled DNI Contract, Siemens paid additional bribes to suppress evidence that it had originally obtained the Contract through corruption.  Excluding evidence of bribery cut off a potential defense to Siemens' arbitration claim and ensured that Siemens would finally receive the economic benefit that its bribery scheme was intended from the start to provide.

3.      Over the course of the bribery scheme, Siemens paid an estimated total of over $100 million in bribes, approximately $31.3 million of which were made after March 12, 2001, when Siemens became subject to U.S. securities laws.  As a result of the bribes it paid, Siemens in 2007 received an award in arbitration against the government of Argentina of over $217 million, plus interest.

4.      During the relevant 2001-07 time period, defendants Uriel Sharef, Ulrich Bock, Carlos Sergi, Stephan Signer, Herbert Steffen, Andres Truppel, and Bernd Regendantz each had a role in authorizing, negotiating, facilitating, or concealing bribe payments in connection with the DNI Contract.  The most senior of these was defendant Uriel Sharef, who was a member of Siemens' Managing Board, or Vorstand.  Siemens employed a group of consultants, designated the Project Group and led by defendant

Sergi, to serve as payment intermediaries between the company and the bribed Argentine government officials.

5.     Each of the defendants violated Section 30A of the Securities Exchange Act of 1934 (the "Exchange Act") by engaging in the bribery of government officials in Argentina. Each defendant also aided and abetted Siemens' violations of Section 30A. The defendants violated Exchange Act Section 13(b)(5) and Rule 13b2-1 thereunder by falsifying documents, including invoices and sham consulting contracts, in furtherance of the bribery scheme. Defendant Regendantz violated Rule 13b2-2 by signing false internal certifications pursuant to the Sarbanes Oxley Act ("SOX"). All defendants aided and abetted Siemens' violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) by substantially assisting in Siemens' failure to maintain internal controls to detect and prevent bribery of government officials in Argentina, and by substantially assisting in the improper recordation of the bribe payments in Siemens' books and records.

## JURISDICTION

6.     This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

7.     Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] or 28 U.S.C. § 1391(d). Certain of the acts and transactions constituting the violations occurred in this District.

8.     The defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

## DEFENDANTS

9.    **Uriel Sharef**, a German citizen, was a Siemens Managing Board[1] Member

from July 2000 to December 2007.  During this period, he served as regional "Coach" for

Siemens Power Generation, Siemens Power Transmission and Distribution, and the

Americas.  From October 2000 to December 2007, Sharef was a member of Siemens'

Corporate Executive Committee.  Sharef met in New York, NY, with payment

intermediaries and agreed to pay $27 million in bribes to Argentine officials in

connection with the DNI Contract.  Sharef also enlisted subordinates to conceal the

payments by circumventing Siemens' internal accounting controls.

10.    **Ulrich Bock**, a German citizen, was from October 1995 through 2001 the

Commercial Head of Major Projects for Siemens Business Services ("SBS"), the Siemens

operating group responsible for managing the DNI Contract.  As the officer responsible

for the DNI Contract, Bock authorized bribe payments to Argentine government officials.

Bock participated in a meeting in Miami, Florida, at which bribes to Argentine officials

were negotiated and promised.  Bock also provided false testimony in two arbitration

proceedings, one of which was filed in Washington, D.C., in an effort to conceal

Siemens' corrupt payments and recover its expected profits from the DNI Contract.

11.    **Stephan Signer**, a German citizen, replaced Bock as Head of Major

Projects for SBS in approximately July 2001, and he remained in the position until 2002.

From 2002 through at least 2008, Signer was the Head of Business Operations and

Finance at Siemens IT Solutions and Services, then a business division of Siemens.

---

[1]    In accordance with German law, Siemens has a Supervisory Board and a Management Board.  The Supervisory Board is a rough equivalent to the board of directors of an American company.  The Managing Board, or "Vorstand," fulfills the duties of senior management and includes the company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").

Signer authorized the payment of bribes to government officials in Argentina. Some of the bribes were paid to bank accounts in the United States.

12.     **Herbert Steffen**, a German citizen, was the CEO of Siemens Argentina from 1983 through 1989, and again in 1991. He was the Group President of Siemens Transportation Systems from 1996 to 2003. Because of his longstanding connections in Argentina and Latin America, Steffen was recruited by Sharef to facilitate the payment of bribes in connection with the DNI Contract. Steffen met directly with senior government officials in Argentina and offered bribe payments to them on Siemens' behalf. Steffen urged defendant Regendantz to authorize bribe payments that ultimately were made to bank accounts in the United States. Steffen also participated in one or more telephone conversations with defendant Sharef, who called him from the United States in connection with the bribery scheme.

13.     **Andres Truppel**, an Argentine citizen, was the CFO of Siemens Argentina from 1996 to 2002. Truppel regularly communicated with Argentine government officials regarding illicit bribe payments. Truppel conveyed Argentine bribe demands to more senior officials at Siemens and urged them to make the bribe payments. Truppel participated in meetings in Miami, Florida, and New York, NY, in which bribes to Argentine officials were negotiated and promised. He caused Siemens to pay, and promise to pay, millions of dollars in bribes in an effort to retain the DNI Contract. Some of the bribes were paid via bank accounts in the United States.

14.     **Carlos Sergi**, an Argentine citizen, was a board member of Siemens Argentina until at least 2002. From the late 1990's until at least 2004, Sergi held himself out as a business consultant for Siemens Argentina. In fact, Sergi's primary role,

continuing to 2007, was to serve as a payment intermediary between Siemens and Argentine government officials in connection with the DNI Contract. While purporting to act as a business consultant for Siemens Argentina, Sergi paid bribes to Argentine government officials on Siemens' behalf. Some of the bribes were paid via bank accounts in the United States.

15.     **Bernd Regendantz**, a German citizen, was CFO of Siemens Business Services ("SBS") from February 2002 to 2004. Upon his arrival at SBS in 2002, Regendantz, who had not earlier been involved in the DNI Contract, was urged by other Siemens officials, including defendants Signer and Steffen, to pay bribes that had previously been negotiated. Regendantz initially resisted making the payments. However, when he sought guidance from several top Siemens officials, Regendantz received consistent instructions that he understood to mean that he should make the payments. Regendantz then authorized two bribe payments totaling approximately $10 million on Siemens' behalf. Some of the amounts were paid into bank accounts in the United States. With Regendantz's knowledge and approval, the nature of the payments was concealed through the use of fictitious invoices, and the payments were recorded inaccurately in SBS's and Siemens' books and records. Regendantz falsely certified to the accuracy and truthfulness of SBS's financial statements

## RELEVANT ENTITIES

16.     **Siemens Aktiengesellschaft ("Siemens")** is a German corporation with its executive offices in Munich, Germany. Siemens is one of the world's largest manufacturers of industrial and consumer products. It employs approximately 402,000 people and operates in approximately 190 countries worldwide. Siemens reported net

revenue of approximately $100 billion and net income of approximately $8.6 billion for its fiscal year ended September 30, 2011.

17.    Siemens had over 874 million common shares outstanding and a market capitalization of over $120 billion as of June 30, 2011. Since March 12, 2001, Siemens' common shares have been registered with the Commission pursuant to Section 12(b) of the Exchange Act. [15 U.S.C. § 78l(b)]. Siemens' American Depository Shares, each representing one common share, trade on the New York Stock Exchange ("NYSE") under the symbol "SI."

18.    Prior to a reorganization in 2008, Siemens operated through a complex array of operating groups and regional companies. The operating groups were divisions within Siemens and not separate legal entities. The regional companies were wholly or partly-owned subsidiaries. Among the operating groups during the relevant period were Siemens Business Services and Power Transmission and Distribution. Among the regional companies was Siemens S.A. (Argentina).

19.    On December 12, 2008, the Commission entered into a settlement with Siemens in connection with the company's bribe payments in Argentina and other countries. Under that settlement, Siemens consented to an injunction against future violations of Sections 30A, 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and disgorged wrongful profits of $350 million. At the same time, Siemens paid a criminal fine of $450 million to settle parallel criminal charges brought by the Department of Justice. Siemens Argentina entered a guilty plea to violations of Exchange Act Section 30A for its payment of bribes in connection with the DNI Contract. Siemens also paid

criminal fines in Germany to the Munich Public Prosecutor in the amounts of €395 million and €201 million.

20.     **Siemens S.A. (Argentina) ("Siemens Argentina")**, headquartered in Buenos Aires, Argentina, was a wholly-owned regional company of Siemens. Beginning in the late 1990's, Siemens Argentina worked in conjunction with SBS and other Siemens affiliates to secure and retain the DNI Contract. Siemens Argentina's financial statements were consolidated into those of Siemens.

21.     **Siemens Busines Services GmbH & Co. OHG ("SBS")**, headquartered in Munich, Germany, was a Siemens operating group that provided consulting, oversight and management services in connection with the DNI Contract. SBS's financial statements were consolidated into those of Siemens.

22.     **Siemens IT Services S.A. ("SITS")** was a special purpose entity organized under Argentine law to bid on and execute the DNI Contract. SITS was wholly-owned by Siemens-Nixdorf Information System GmbH, a Siemens operating group that later merged with SBS. SITS's financial statements were consolidated into those of Siemens.

23.     **Siemens Power Transmission and Distribution ("Siemens PTD")** formerly headquartered in Erlangen, Germany, was a Siemens operating group responsible for manufacturing large scale power systems. PTD was not directly involved in the DNI Contract. However, the defendants concealed certain of the DNI Contract bribe payments and circumvented Siemens' internal controls by routing the payments through unrelated PTD contracts.

24.     **The Project Group**, headquartered in Central and South America, was an informal designation for a collection of entities that served as intermediaries through

which Siemens made corrupt payments to Argentine government officials. The Project Group was led and controlled by Carlos Sergi and included his family members and close associates as principals. The Project Group was created to coordinate the DNI Contract bribe payments and to provide a single point of contact for Siemens in negotiating its bribe payments to Argentine government officials.

**FACTS**

**A.    Bribes Paid to Obtain the DNI Contract and to Revive the Contract after its Suspension by the Argentine Government**

25.    In 1994, the Argentine government, headed by then President Carlos Menem, issued a tender for bids on a contract to replace the country's manually-created national identity booklets with state-of-the-art identity cards. The estimated cost of the project was $1 billion. Siemens and its Argentine affiliate SITS submitted a bid in December 1996 and won the project in February 1998. A contract was executed by SITS with the Argentine Ministry of the Interior the following November. Throughout this period, and indeed over the life of the DNI Contract, bribes were sought by and paid to Argentine government officials, up to and including the President of Argentina and Cabinet Ministers.

26.    In August 1999, after Argentina became enveloped in a debt crisis, President Menem suspended the DNI Contract while he campaigned for re-election. President Menem subsequently lost his re-election bid to Fernando De la Rua, who just one month later notified Siemens Argentina that the DNI Contract would be terminated unless Siemens agreed to renegotiate its terms.

27.    In December 2000, Uriel Sharef, a Siemens Managing Board Member, and Herbert Steffen, then Group President of Siemens Transportation Systems, met

personally with new President De la Rua and other senior Argentine government officials to discuss the DNI Contract. At the meeting, President De la Rua demanded significant price concessions to the contract. Siemens agreed to the concessions in return for President De la Rua's promise to issue a national decree mandating the purchase of new DNI cards for all Argentine citizens, and thus re-authorizing the DNI Contract.

28. As defendants Sharef and Steffen negotiated with President De la Rua, other Siemens managers, including defendant Bock, met with the intermediaries who had earlier been involved in paying the bribes on Siemens' behalf that had enabled Siemens to obtain the DNI Contract in the first place. The payment intermediaries were designated the "Project Group" and were led by Carlos Sergi, a former Siemens official. Members of the Project Group advised the Siemens officials that Siemens would have to pay the remaining unpaid but promised bribes to officials connected with the former Menem administration, as well as make additional bribe payments to members of the new De la Rua administration, including to President De la Rua himself, in order to have the DNI Contract reauthorized. Sergi and members of the Project Group told the Siemens officials that the past and present Argentine officials were demanding a total of $27 million in corrupt payments to secure the entry of a decree by President De la Rua reauthorizing the DNI Contract.

29. Bribery was openly discussed at Bock's meetings with the Project Group, as documented by Bock's contemporaneous handwritten notes, as well as internal memoranda and meeting minutes prepared by Project Group members. Bock's notes from a November 22, 2000, meeting with defendant Sergi refer to "topics...discussed in mutual agreement" with others, including Truppel. The notes list the initials of Argentine

officials and the amounts due to each. In total, the notes identify $50.5 million either due

or paid to government officials in connection with the DNI Contract, including

$16 million to former President Menem. A November 26, 2000, memorandum, written

by members of the Project Group, recites that all future bribe payments will be made

through the Project Group and that "[t]he commitment with future third parties is 27 M."

30.     On January 3, 2001, Siemens, via its operating group SBS, signed a $27

million sham consulting agreement with MFast Consulting AG ("MFast"), an entity

controlled by the Project Group. Bock co-signed the sham contract on behalf of SBS.

The MFast contract did not require MFast to provide any bona fide services. Instead, the

sole purpose of the contract was to provide a vehicle through which Siemens could funnel

bribe payments to Argentine government officials.

**B.      Sham Consulting Agreement with a Former Argentine
         Minister of Justice**

31.     In addition to the sham agreement with MFast, Siemens executives found

other ways to exert a corrupt influence on the DNI Contract. In March 2001, the same

month that Siemens became listed on the NYSE, defendant Truppel pressured the

management of SITS to sign a $1 million sham consulting agreement with a company

owned by a former Argentine Minister of Justice. The former Justice Minister reportedly

had close ties to the head of the Sindicatura General de la Nación ("SIGEN"), the

national audit board charged with approving the renegotiated DNI contract. SIGEN's

role in Argentina may roughly be compared to that of the General Accountability Office

in the United States. Defendant Truppel told Siemens officials that the former Justice

Minister could influence SIGEN's decision to recommend approval of the revised DNI

Contract.

32.     The former Justice Minister's firm provided no bona fide services on behalf of Siemens. Instead, it was paid solely for the purpose of exerting influence on Siemens' behalf with SIGEN. SITS made an upfront payment of $605,000 to the former Justice Minister's firm on March 20, 2001, and a second payment of $211,750 on July 18, 2001.

**C.      Cancellation of the DNI Contract**

33.     Despite the efforts of Siemens and its affiliates to reauthorize the DNI Contract through the bribery of government officials, the De la Rua administration on May 18, 2001, cancelled the DNI Contract. Days later, SBS gave notice of its intent to terminate all subcontracts related to the project, including the $27 million sham consulting agreement with MFast.

34.     In an effort to have the DNI Contract reinstated, defendant Sharef and Siemens' then-CEO formed a "crisis management team" to assume control over the DNI project. The team members included defendants Truppel, Steffen, and Signer, who replaced Bock as Head of Major Projects at SBS in July 2001.

35.     At about the same time, Siemens prepared to initiate an arbitration proceeding with the World Bank's International Centre for Settlement of Investment Disputes ("ICSID") in Washington, DC, to recover its lost profits and out of pocket costs resulting from the cancellation of the DNI Contract. In July 2001, Siemens sent a letter to the ICSID arbitration board in Washington, DC, to preserve its right to file an ICSID arbitration claim. This triggered a six-month period for settlement negotiations with the Argentine government.

36.     Notwithstanding the DNI Contract's cancellation, defendant Sergi and the Project Group advised Siemens that the Argentine government officials who had helped

Siemens secure the DNI Contract still expected to be paid the bribes they had been promised but had not yet received. Sergi also demanded that he be reimbursed for the bribes that he had advanced to government officials on Siemens' behalf. If the payment demands were not met, Sergi threatened to go public with corruption allegations against Siemens.

37.     In order to preserve the viability of Siemens' ICSID arbitration claim, it was necessary for the company to exclude from the proceeding any evidence that Siemens had originally obtained the DNI Contract through bribery. Evidence of corruption in the award of the contract would have presented a potential defense for the Argentine government. In order to suppress that evidence, the defendants authorized and paid additional bribes to Argentine officials. Sergi, Truppel, Steffen, and Bock continuously urged Siemens management to funnel more money to Argentine officials. Truppel urged Siemens management to pay the outstanding promised bribes to Argentine government officials, not only to avoid disqualification from the ICSID arbitration, but also to prevent potential physical harm to him and other Siemens employees in Argentina.

38.     On July 6, 2001, Truppel and Bock met with Sergi and his associates in Miami, Florida, to devise a method of paying the $27 million in bribes that had originally been intended to be made via the then-terminated sham MFast contract. Bock agreed to pay Sergi $27 million to satisfy the bribery demands by the Argentine officials, and Sergi gave instructions that the money be sent to Sergi's Swiss bank account within thirty days. Following the Miami meeting, Bock advised Signer of the agreement to pay $27 million through Sergi to the Argentine officials. Bock later attempted to initiate the payment, but

was unable to persuade Siemens' legal and compliance departments that the company had a legitimate commercial basis for making it.

**D. SBS Authorizes an "Advance Payment" of up to $10 Million**

39. Defendant Regendantz became the Chief Financial Officer of SBS in February 2002. As soon as Regendantz arrived at SBS, defendants Signer, Steffen, and Truppel pressured him to authorize additional bribe payments to Argentina. Defendant Signer told Regendantz that Siemens had paid or promised approximately $70 million to various Argentine officials to obtain the DNI Contract, and that $27 million remained owing to the Argentine officials even though the contract had been cancelled.

40. Initially Regendantz, who had no prior dealings with the DNI Contract, resisted authorizing the bribes. Regendantz had several meetings and telephone conversations with defendant Steffen in the Spring of 2002 in which Steffen urged Regendantz to authorize bribe payments from SBS to Argentine officials. In April 2002, Steffen told Regendantz that SBS had a "moral duty" to make at least an "advance payment" of $10 million to Sergi and the other payment intermediaries. Steffen claimed that he, Truppel, and other employees of Siemens Argentina were being threatened because the long-promised bribes remained unpaid.

41. Over a period of weeks, Regendantz sought guidance from Siemens' Head of Compliance, Chief Financial Officer, Chief Executive Officer, and two members of the Managing Board, one of whom was defendant Sharef. In each instance, Regendantz explained that the payment demands lacked any legitimate commercial basis and that he was reluctant to authorize them. In each instance, Regendantz's superiors gave every indication that they were familiar with the DNI Contract and with the nature of the

payment demands. And in each instance, his superiors told Regendantz that it was his responsibility to find a solution to the problem. Regendantz understood these responses from his superiors to be an instruction that he authorize the bribe payments.

42.     Ultimately, Regendantz authorized the advance payment of up to $10 million in bribes to Argentine officials, through the Project Group. A portion of those bribes were paid to bank accounts in New York and Miami.

43.     During this period, Siemens was negotiating with the Argentine government pursuant to the preservation period allowed by the ICSID arbitration. In May 2002, Siemens filed its ICSID arbitration claim, demanding over $550 million from the Argentine government for the terminated DNI Contract. The defendants were aware of the pending ICSID arbitration.

**E.      $5.2 Million Payment Through Meder Holding Corporation**

44.     The first tranche of the $10 million advance payment authorized by Regendantz consisted of a $5.2 million payment to Argentine officials that was routed through an intermediary in Uruguay. Defendants Truppel and Signer, with the help of defendant Bock and subordinate SBS employees, generated a series of fictitious documents to facilitate the payment and to obscure the audit trail.

45.     In the summer of 2002, defendant Signer had Bock and a subordinate SBS employee sign a backdated consulting agreement with Meder Holding Corporation S.A. ("Meder"), a Uruguay front company controlled by the Project Group. Signer also instructed the SBS employee to sign backdated invoices from Meder totaling approximately $5.2 million.

15

46.     In May 2002, defendant Truppel sent Signer the Meder invoices, which were backdated to 2001 and early 2002. The invoices were purportedly for "market development in Chile and Uruguay" and included wire transfer instructions to a Standard Chartered bank account in New York. The references to "market development in Chile and Uruguay" were false. The payments were not made in connection with any such work.

47.     Regendantz instructed a subordinate to handle the paperwork related to the bribe payments to Argentina. On July 19, 2002, Regendantz's subordinate authorized the $5.2 million payment to Meder, and on July 22, 2002, SBS wired the funds to the designated Standard Chartered bank account in New York. The payment was incorrectly recorded in Siemens' books and records.

48.     The second tranche of the $10 million "advance," in the amount of approximately $4.7 million, was not made until February 2004

**F.      January 2003 Meeting in New York Between Defendants
          Sharef and Sergi to Negotiate Further Bribe Payments**

49.     Following the $5.2 million Meder payment, defendant Sergi and the Project Group continued to relay bribery demands from Argentine officials. On January 16, 2003, defendant Sharef met with Sergi in New York, NY, to negotiate the terms of Siemens' payment. One difficulty in responding to the demands was that, because the DNI Contract had been terminated by the Argentine government and work on the DNI project had ceased, Siemens officials lacked a plausible business justification for making the payments.

50. At the New York meeting, Sharef and Sergi addressed this problem by devising a strategy to conduct a sham arbitration involving the then-terminated MFast contract as a means for funneling the bribe payments to government officials in Argentina. Siemens owed no bona fide payment obligation under the MFast contract because the contract itself was a sham arrangement. But if MFast initiated an arbitration proceeding against Siemens for wrongful termination and then either prevailed or negotiated a settlement, the resulting award would be available to satisfy the longstanding bribe demands. The sham MFast arbitration did eventually take place, but it was not initiated until 2005.

## G. $11.79 Million Payment through Dubai Intermediary in 2003

51. In the first half of 2003, much of the promised $27 million remained unpaid, and the payment demands by Sergi on behalf of Argentine officials continued. Defendants Signer, Truppel, and Steffen urged Sharef to meet the demands and make the additional payments. In mid-2003, on Sharef's instruction, the Commercial Head of Siemens PTD, Truppel, and others initiated a plan to have Siemens PTD, a division unrelated to the DNI project, funnel €9.6 million (or approximately $11.79 million) to Sergi and the Project Group through an intermediary company in Dubai. By making the bribe payment through PTD, the payment could be falsely recorded in Siemens' books and records as an expense incurred in connection with an active PTD project, rather than with the then-terminated DNI Contract.

52. In March 2003, Sharef called the Commercial Head of PTD and told him that Sharef needed PTD's help in transferring funds from Siemens PTD to South America

17

in connection with an SBS project. Sharef told the PTD official that there was an urgent need for the funds, and that the money would be reimbursed to PTD later.

53.     On defendant Sharef's instruction, the PTD official contacted the Dubai payment intermediary and asked for its assistance in making the transfer. Sharef instructed the PTD official to put the Dubai intermediary in touch with defendant Truppel, who would provide payment details. Pursuant to Truppel's payment instructions, the Dubai intermediary transferred €9.6 million to bank accounts in the Bahamas maintained by the Project Group for one or more Argentine government officials. Using phony invoices to conceal the corrupt nature of the payment, the Dubai intermediary charged the payment to a PTD contract unrelated to the DNI project.

54.     Because the €9.6 million payment was for the benefit of an SBS project, in late 2003 PTD sought reimbursement of the payment amount from SBS. Defendant Regendantz instructed his subordinate to find a way to process the reimbursement without disclosing the underlying nature of the corrupt payment. To support the reimbursement, the subordinate and his counterpart at PTD fabricated justifications for fictitious invoices totaling €9.6 million ($11.79 million). PTD submitted the phony invoices to SBS between December 2003 and February 2004. SBS made the reimbursement payments to PTD in 2004.

**H.     $4.7 Million Payment to Companies Linked to the Project Group in 2004**

55.     The second tranche of the $10 million "advance payment" authorized by Regendantz was made in 2004. In late 2003, defendant Sharef informed the then-CEO of Siemens Argentina that Sharef had reached an agreement to pay an additional $4.7 million in bribes to government officials through Sergi. Sharef instructed the

Siemens Argentina CEO to provide defendant Sergi with whatever information Sergi needed to prepare the fictitious invoices needed to support the $4.7 million payment.

56.     Sergi, on instructions from Sharef, submitted eight fictitious invoices totaling $4.7 million to the Siemens Argentina CEO, who then forwarded them to Regendantz. The invoices were purportedly for "consulting services" provided to SBS by four companies, each affiliated with MFast. The invoices were not linked to any identifiable contracts, nor were they linked to any projects on SBS's books and records.

57.     Regendantz instructed his subordinate to handle payment of the invoices. The subordinate noticed an error in one of the invoices and called the Siemens Argentina CEO, telling him, "if we have to produce crap, we should at least do it correctly." The Siemens Argentina CEO submitted revised invoices. Regendantz's subordinate then generated a memo, backdated to October 10, 2003, to support the sham projects and expenses reflected by the invoices. Defendant Signer instructed an SBS subordinate to sign the backdated, fictitious invoices supporting the $4.7 million payment.

58.     Payments to two of the companies identified on the invoices were made in February 2004 to bank accounts held at the International Bank of Miami. Siemens improperly accounted for the payments as "consulting expenses" in its books and records.

59.     Between 2002 and 2006, Regendantz signed quarterly and annual certifications pursuant to the Sarbanes-Oxley Act falsely representing that the financial statements of SBS "do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." The quarterly certifications also falsely represented that the financial statements of SBS "fairly present in all material

19

respects the financial condition, results of operations, and cash flows." The quarterly and annual certifications were presented to the auditors of SBS and Siemens in connection with the companies' quarterly reviews and annual audits.

## I.      The ICSID Arbitration in Washington, DC

60.    In May 2002, Siemens instituted an arbitration proceeding against the government of Argentina through the ICSID in Washington, DC, seeking $550 million in lost profits and expenses as a result of Argentina's allegedly wrongful termination of the DNI Contract. Had the government of Argentina introduced evidence showing that Siemens had obtained the DNI Contract through bribery, that evidence would have stood as a defense to the company's breach-of-contract claim. Siemens, however, succeeded in keeping any evidence or allegation of bribery out of the ICSID arbitration until September 2005, by which time the evidence was too late to be considered. Siemens suppressed the evidence of corruption through the false testimony of defendants Truppel, Bock, and Sharef, and by paying the bribes demanded by Sergi and the Project Group, which had threatened to disclose the corrupt nature of the DNI Contract.

61.    In September 2005, the government of Argentina did invoke corruption as a defense to Siemens' arbitration claim. Despite knowing the truth -- that the DNI Contract had indeed been obtained through large-scale bribery -- Siemens officially denied the corruption allegations. Argentina ultimately lost its ability to assert the defense on the ground that the defense had not been timely raised.

62.    On February 6, 2007, Siemens was awarded $217,838,430 in the ICSID arbitration against the government of Argentina for Siemens' loss of investment, plus interest. This award represented the economic benefit that Siemens' bribery scheme had

long sought to obtain. However, in August 2009, after settling bribery charges with the Commission, the Department of Justice, and the Munich Public Prosecutor, Siemens waived the ICSID award.

## J.    The MFast Arbitration

63.    On March 15, 2005, MFast initiated a private arbitration proceeding against SBS with the International Chamber of Commerce ("ICC") in Zurich, Switzerland, to recover the $27 million in bribe payments that it had been promised for Argentine officials under the corrupt contract it signed with SBS in January 2001. Siemens did not attempt to defend the ICC arbitration on the grounds that the MFast contract was part of an illegal bribery scheme involving the DNI Contract. Nor did Siemens reveal that the ICC arbitration was a sham proceeding concocted by defendants Sharef and Sergi during their meeting in New York. Instead, once the arbitration commenced, Siemens' management withheld any evidence of corruption from the ICC proceeding and quickly settled with MFast. The settlement kept the MFast bribery scheme from coming to light and thereby endangering the hundreds of millions of dollars at stake in the then-pending ICSID arbitration.

64.    Due to his involvement in the DNI project as Head of Major Projects, defendant Bock was called to testify in both the ICSID and MFast arbitration proceedings. Instead of revealing the corruption and bribery surrounding the DNI and MFast contracts, Bock concealed the illicit bribery activity in Argentina. In return for Bock's silence, defendant Signer and others arranged for Siemens to pay Bock and a family member approximately $316,000 from 2005 to 2007 through sham consulting agreements.

65.    On November 9, 2006, despite knowing that the sole purpose of the MFast contract was to funnel bribes to Argentine government officials, Siemens' management settled the ICC arbitration by agreeing to pay MFast $8.8 million.  Payment was made in January 2007.

66.    The $8.8 million payment was itself a bribe designed to satisfy defendant Sergi and the Argentine government officials who were owed money, and to keep them from revealing the extensive bribery surrounding the DNI Contract.  The settlement agreement with MFast expressly barred Sergi and his associates from "involv[ing] themselves in [the ICSID Arbitration Proceedings], either directly or indirectly, or in any other manner influenc[ing] said proceedings, even if only by passing on information...."  The settlement agreement also barred Sergi and his associates from serving as witnesses in the ICSID proceedings.

## CLAIMS FOR RELIEF
### FIRST CLAIM
#### [Violations of Section 30A of the Exchange Act]

67.    Paragraphs 1 through 66 are realleged and incorporated by reference.

68.    As described above, defendants Sharef, Bock, Steffen, Truppel, Signer, Sergi, and Regendantz corruptly offered, promised to pay, or authorized payments to one or more persons, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purpose of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their official duties, securing an improper advantage, or inducing such foreign officials to use their influence with foreign governments or instrumentalities thereof to assist Siemens in obtaining or retaining business.

22

69.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange

Act [15 U.S.C. § 78t(e)], defendants Sharef, Bock, Steffen, Truppel, Signer, Sergi, and

Regendantz violated, and aided and abetted Siemens' violations of, and unless enjoined

will continue to violate, and aid and abet violations of, Section 30A of the Exchange Act.

[15 U.S.C. § 78dd-1]

## SECOND CLAIM
### [Violations of Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder]

70.     Paragraphs 1 through 69 are realleged and incorporated by reference.

71.     As described above, defendants Sharef, Bock, Steffen, Truppel, Signer,

Sergi, and Regendantz knowingly circumvented or knowingly failed to implement a

system of internal accounting controls or knowingly falsified books, records or accounts

as described in Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)] or falsified

or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the

Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

72.     As described above, defendant Regendantz directly or indirectly made or

caused to be made a materially false or misleading statement to an accountant in

connection with an audit, review or examination of the financial statements of Siemens.

73.     By reason of the foregoing, defendants Sharef, Bock Steffen, Truppel,

Signer, Sergi, and Regendantz violated, and unless enjoined will continue to violate,

Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1

thereunder [17 C.F.R. § 240.13b2-1], and, as to defendant Regendantz, Rule 13b2-2

thereunder [17 C.F.R. § 240.13b2-2].

## THIRD CLAIM
### [Aiding and Abetting Violations
of Section 13(b)(2)(A) of the Exchange Act]

74.    Paragraphs 1 through 73 are realleged and incorporated by reference.

75.    As described above, defendants Sharef, Bock, Steffen, Truppel, Signer, Sergi, and Regendantz knowingly provided substantial assistance to Siemens' failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

76.    By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], defendants Sharef, Bock, Steffen, Truppel, Signer, Sergi, and Regendantz aided and abetted Siemens' violations of, and unless enjoined will continue to aid and abet violations of, Section 13(b)(2)(A) of the Exchange Act.  [15 U.S.C. § 78m(b)(2)(A)].

## FOURTH CLAIM
### [Aiding and Abetting Violations
of Section 13(b)(2)(B) of the Exchange Act]

77.    Paragraphs 1 through 76 are realleged and incorporated by reference.

78.    As described above, defendants Sharef, Bock, Steffen, Truppel, Signer, Sergi, and Regendantz knowingly provided substantial  assistance to Siemens' failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:  (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for its assets.

24

79.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act

[15 U.S.C. § 78t(e)], defendants Sharef, Bock, Steffen, Truppel, Signer, Sergi, and

Regendantz aided and abetted Siemens' violations of, and unless enjoined will continue

to aid and abet violations of, Section 13(b)(2)(B) of the Exchange Act.  [15 U.S.C.

§ 78m(b)(2)(B)]

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final

judgment:

A.      Permanently restraining and enjoining defendants Sharef, Bock, Steffen,

Truppel, Signer, Sergi, and Regendantz from violating Exchange Act Sections 30A and

13(b)(5), and Rule 13b2-1 thereunder, and, as to defendant Regendantz, Rule 13b2-2

thereunder, [15 U.S.C. §§ 78dd-1 and 78m(b)(5); and 17 C.F.R. §§ 240.13b2-1 and

240.13b2-2] and from aiding and abetting violations of Exchange Act Sections 30A,

13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A), and 78m(b)(2)(B)].

B.      Ordering defendants to disgorge ill-gotten gains wrongfully obtained as a

result of their illegal conduct, including prejudgment interest;

C.     Ordering defendants to pay a civil penalty pursuant to Exchange Act Sections 21(d)(3) and 32(c) [15 U.S.C. §§ 78u(d)(3) and 78ff(c)]; and

D.     Granting such further relief as the Court may deem just and appropriate.

Dated:  December 13, 2011

Respectfully submitted,

Paul W. Kisslinger (PK 0764)
Robert I. Dodge (RD 0433)
Kara Brockmeyer
Tracy L. Price
Denise Hansberry

Attorneys for Plaintiff,
U.S. Securities and Exchange
Commission
100 F Street, N.E.
Washington, DC  20549-5949
(202) 551-4427 (Kisslinger)
KisslingerP@sec.gov
(202) 551-4421 (Dodge)
DodgeR@sec.gov