UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



-------------------------------------------------- X

U.S. SECURITIES AND EXCHANGE
COMMISSION,

              **Plaintiff,**

     **- against -**

URIEL SHAREF, ULRICH BOCK,
CARLOS SERGI, STEPHAN SINGER,
HERBERT STEFFEN, ANDRES
TRUPPEL, AND BERND
REGENDANTZ,

            **Defendants.**

-------------------------------------------------- X

**OPINION AND ORDER**

**11 Civ. 9073 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      The Securities and Exchange Commission ("SEC") commenced this

action against Uriel Sharef, Ulrich Bock, Carlos Sergi, Stephan Signer, Herbert

Steffen, Andres Truppel, and Bernd Regendantz ("defendants"), former senior

executives at Siemens Aktiengesellschaft ("Siemens"), a multinational engineering

and electronics conglomerate headquartered in Germany.  The SEC alleges four

causes of action: (1) violations of Section 30A of the Exchange Act of 1934 (the

"Exchange Act"); (2) violations of Section 13(b)(5) of the Exchange Act; (3)

1

aiding and abetting violations of Section 13(b)(2)(A) of the Exchange Act; and (4)

aiding and abetting violations of Section 13(b)(2)(B) of the Exchange Act.[1]

Herbert Steffen now moves to dismiss the Complaint pursuant to

Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds

that this Court lacks personal jurisdiction and the Complaint was untimely.[2]

## II.    FACTUAL BACKGROUND

Siemens, a German corporation headquartered in Munich, Germany[3],

is one of the world's largest manufacturers of industrial and commercial products.[4]

Steffen, a 74-year-old German citizen was the CEO of Siemens S.A. Argentina, a

wholly owned subsidiary of Siemens[5], from 1983 through 1989, and again in

1991.[6]  He was then the Group President of Siemens Transportation Systems from

1996 until his retirement in 2003.[7]

---

[1]    *See* Complaint ("Compl.") ¶¶ 69, 73, 76, 79.

[2]    Because I find that personal jurisdiction is lacking, I do not reach the argument that the Complaint was untimely filed.

[3]    *See* Compl. ¶ 16.

[4]    *See id.*

[5]    *See id.* ¶ 20.

[6]    *See id.* ¶ 12.

[7]    *See id.*

2

## A.   Overview of the Alleged Bribery Scheme

The Complaint alleges that between 1996 and 2007 the defendants orchestrated a bribery scheme which paid millions of dollars in bribes to top government officials in Argentina.[8]   Over the course of the bribery scheme, Siemens paid an estimated $100 million in bribes, approximately $31.3 million of which were paid after March 12, 2001, when Siemens became subject to U.S. securities laws.[9]  In the course of paying these bribes Siemens made false certifications pursuant to the Sarbanes-Oxley Act representing the truthfulness of its quarterly and annual certifications.[10]

In 1998, Siemens and its Argentine affiliate were awarded the contract for a one billion dollar project to create national identity cards.[11]   The Complaint alleges that throughout the bid process, and the life of the contract, the Argentine government sought bribes, which were paid by Siemens.[12]  In August 1999, the contract was suspended due to political turmoil, and Siemens was notified that it

---

[8]      *See id.* ¶ 1.

[9]      *See id.*

[10]     *See id.*  ¶ 59.

[11]     *See id.* ¶ 25.

[12]     *See id.*

would not be renewed unless the terms were renegotiated with the new government.[13]    Beginning in December 2000, Steffen and Sharef, a Siemens Managing Board Member, began renegotiating with the Argentine government, including the newly elected President.[14]  The government demanded that Siemens pay it bribes in order to reinstate the contract.[15]  As a result, Siemens, via its operating group Siemens Business Services ("SBS"), began to pay $27 million in bribes to obtain the reauthorization of the contract.[16]  SBS signed a $27 million sham consulting agreement with Mfast Consulting AG ("Mfast"), a front company.[17]  The purpose of this transaction was to provide a cover for the bribes funneled to the Argentine government.  Despite these efforts the contract was canceled.[18]

In May 2002, Siemens initiated an arbitration proceeding with the World Bank's International Centre for Settlement of Investment Disputes

---

[13]    *See id.* ¶ 26.

[14]    *See id.* ¶¶ 27-28.

[15]    *See id.* ¶ 28.

[16]    *See id.* ¶¶ 29-30.

[17]    *See id.* ¶ 30.

[18]    *See id.* ¶ 33.

("ICSID") to recover lost profits and costs resulting from the cancellation of the contract.[19]  Because evidence of corruption in the initial award of the contract would have provided Argentina with a defense to Siemens' ICSID claim, Siemens worked to conceal its bribery.[20]  As part of this effort, Steffen and the other defendants continuously urged Siemens management to funnel more money to Argentine officials to ensure that the earlier bribes were not disclosed.[21]  In 2007, Siemens was awarded $217 million in the arbitration proceeding.[22]  The SEC alleges that the award was issued because Siemens paid additional bribes to suppress evidence that the contract itself was awarded to Siemens as a result of bribes it paid to the government.[23]

Between 2002 and 2006, defendant Bernd Regendantz, Chief Financial Officer of SBS, signed quarterly and annual certifications under the Sarbanes-Oxley Act in which he represented that SBS's financial statements were

---

[19]     *See id.* ¶ 35.

[20]     *See id.* ¶ 37.

[21]     *See id.*

[22]     *See id.* ¶ 60.

[23]     *See id.* ¶¶ 37, 60.

not false or misleading.[24]  The SEC alleges, that in light of the bribery scheme,
these certifications were fraudulent.[25]

### B.   Steffen's Alleged Role in the Bribery Scheme

The Complaint alleges that Sharef recruited Steffen "to facilitate the
payment of bribes" to officials in Argentina because of his longstanding
connections in Argentina, which he acquired during his tenure at Siemens
Argentina.[26]  Following the cancellation of the contract, beginning in December
2000, Steffen and Sharef began renegotiating with the Argentine government,
including the newly elected President, which demanded that Siemens pay it bribes
in order to reinstate the contract.[27]

In order to facilitate payment of bribes to the Argentine officials,
Steffen met several times with Regendantz, who became the Chief Financial

---

[24]    *See id.* ¶ 59.

[25]    *See id.*

[26]    *See id.* ¶ 12.  At all times relevant to this case, Steffen was Group
President of Siemens Transportation Systems until he retired in 2003.  *See id.*

[27]    *See id.* ¶¶ 27-28.  Meanwhile, other Siemens managers, including
defendant Bock, met with payment intermediaries who had been involved in the
earlier payment of bribes on Siemens' behalf, including former Siemens official
and defendant Sergi.  These payment intermediaries informed the Siemens
managers that they would have to pay the remaining unpaid but promised bribes as
well as new bribes.

Officer of SBS in February 2002, and "pressured" Regendantz to authorize bribes from SBS to Argentine officials.[28]  In April 2002, Steffen told Regendantz that SBS had a "moral duty" to make at least an "advance payment" of ten million dollars to the individuals who had previously handled the bribes because he and other individuals were being threatened as a result of the unpaid bribes.[29]

Once Regendantz authorized the bribes, the allegations against Steffen are limited to participation in a phone call initiated by Sharef from the United States in connection with the bribery scheme, and that in the first half of 2003, defendants including Steffen "urged Sharef to meet the demands [of Argentine officials] and make the additional payments."[30]

## C.    SBS's Payment of the Bribes and Cover Ups

Regendantz ultimately authorized a ten million dollar bribe, but only after seeking additional guidance from "superiors" including Siemens' Head of Compliance, Chief Financial Officer, Chief Executive Officer, and two members of

---

[28]    *See id.* ¶¶ 39-40.

[29]    *Id.*

[30]    *Id.* ¶¶ 12, 51.  These meetings ultimately led to the payment of an additional $11.79 million payment, but it is not alleged that Steffen directed or did anything more than urge Sharef to make additional payments.  *See id.* ¶¶ 51-54.

the Managing Board, including Sharef, whose responses he "understood . . . to be instructions that he authorize the bribe payments."[31]

The bribe was paid in two installments: $5.2 million was routed through an intermediate in Uruguay.[32] Certain defendants and subordinate SBS employees, at Regendantz' instruction, generated a series of fictitious documents to facilitate the payment and obscure the audit trail, including payment of false invoices one of which included wire transfer instructions to a bank account in New York.[33] Following the $5.2 million payment, defendant Sergi and the payment intermediaries continued to relay bribery demands from Argentine officials. Certain meetings regarding the payment of bribes occurred in New York, but Steffen was never present.[34]

The second payment of the $10 million advance, in the amount of $4.7 million was not made until February 2004.[35] By that time, Steffen had retired

---

[31] *Id.* ¶ 41.  A portion of the bribes were paid to bank accounts in New York and Miami. *See id. ¶* 42.

[32] *See id. ¶* 44.

[33] *See id. ¶¶* 44-47.

[34] *See id. ¶¶* 49-50.

[35] *See id. ¶¶* 48, 55.

and the Complaint alleges that Sharef and other defendants dealt with the then CEO of Siemens Argentina to obtain the information needed to prepare fictitious invoices to support the $4.7 million payment.[36]

In connection with these payments, between 2002 and 2006, Regendantz signed quarterly and annual certifications pursuant to the Sarbanes-Oxley Act falsely representing the financial statements of SBS.[37] These certifications were presented to auditors and SBS and Siemens in connection with the companies' quarterly reviews and annual audits.[38]

## III.   LEGAL STANDARD

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction the "plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."[39]   However, when the issue "is decided initially on the pleadings

---

[36]   *See* ¶¶ 55-58.  Sergi, on instructions from Sharef, submitted eight fictitious invoices totaling $4.7 million to the then Siemens Argentina CEO, who then forwarded them to Regendantz.  Defendant Signer instructed an SBS subordinate to sign the backdated, fictitious invoices supporting the $4.7 million payment.  Two of the payments made in 2004 were to bank accounts in Miami. *See id.*

[37]   *See id.* ¶ 59.

[38]   *See id.*

[39]   *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir.2003).

and without discovery, the plaintiff need only show a prima facie case."[40]  A court may consider materials outside the pleadings,[41] but must credit plaintiffs' averments of jurisdictional facts as true.[42]  "[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."[43]  Nonetheless, where a defendant "rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction – and plaintiffs do not counter that evidence – the allegation may be deemed refuted."[44]

---

[40]      *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984).  *Accord Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 725 (S.D.N.Y. 2010) ("As no discovery has yet taken place, to survive a motion to dismiss the plaintiff must plead factual allegations [that] constitute a prima facie showing of jurisdiction.") (quotation marks omitted).

[41]      *See In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 566 (S.D.N.Y. 2012).

[42]       *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)

[43]      *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993). *Accord Whitaker*, 261 F.3d at 208.

[44]      *Recurrent Capital Bridge I, LLC v. ISR Sys. & Sensors Corp.*, 875 F. Supp. 2d 297, 304 (S.D.N.Y. 2012) (quoting *Schenker v. Assicurazioni Generali S.p.A., Consol.*, No. 98 Civ. 9186, 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002)).

## IV.   APPLICABLE LAW

Section 27 of the Exchange Act, specifically 15 U.S.C. Section 78aa, governs the exercise of personal jurisdiction in securities cases.[45]  Section 27, "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment."[46]  As set forth by the Supreme Court in *International Shoe v. Washington*, due process requires that if a defendant is "not present within the territory of the forum, he [must] have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[47]  The analysis consists of two components: the minimum-contacts analysis and a reasonableness inquiry.[48]

### A.    Minimum Contacts

------

[45]    15 U.S.C. § 78aa(b)(2)(2010). The section provides in relevant part: "The district courts of the United States . . . shall have jurisdiction of an action . . . alleging a violation of the antifraud provisions of this chapter involving – (2) conduct occurring outside the United States that has a *foreseeable substantial effect* within the United States." (emphasis added)

[46]    *SEC v. Unifund SAL,* 910 F.2d 1028, 1033 (2d Cir. 1990) (citing *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1339 (2d Cir. 1972) *abrogated on other grounds by Morrison v. National Austl. Bank*, — U.S. —, 130 S. Ct. 2869 (2010)).

[47]    326 U.S. 310, 316 (1945) (quotation marks and citation omitted).

[48]    *See King County, Wash. v. IKB Deutsche Industriebank AG,* 712 F. Supp. 2d 104, 111 (S.D.N.Y. 2010).

A nonresident defendant sued under the Exchange Act need not have minimum contacts with the state seeking to exercise personal jurisdiction; rather the only contacts required are with the United States as a whole, as Section 78 provides for nationwide service of process.[49] To establish the minimum contacts necessary to satisfy due process, the plaintiff must show that his "claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."[50] The SEC alleges specific jurisdiction over Steffen,[51] which requires that a defendant has "purposefully directed his activities towards the forum and the litigation arises out of or is related to the defendant's contact with the forum."[52]

---

[49]     *See In re Magnetic Audiotape Antitrust Litig.*, 334 F. 3d at 207 (discussing the Clayton Act's analogous service of process provision)  (citing *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974)).

[50]     *Bank Brussels Lambert v. Fiddler Gonzales & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2007) (internal quotation marks omitted).

[51]     *See* Opp. Mem. at 10-11. The other type of personal jurisdiction a court may exercise – general jurisdiction – exists if the defendant's contacts with the forum have been continuous and systematic.  *See In re Astrazeneca Sec. Litig.,* 559 F. Supp. 2d 453, 466 (S.D.N.Y. 2008).

[52]     *In re Astrazeneca,* 559 F. Supp. 2d at 466-67.  Jurisdiction over "the representative of a corporation may not be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual officers and directors must

It is well-established that a court may exercise personal jurisdiction over a foreign defendant who causes an effect in the forum by an act committed elsewhere.[53]  However, "this is a principle that must be applied with caution, particularly in an international context."[54]  "'[F]oreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause."[55]  Rather defendants must have "followed a course of conduct directed at . . . the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."[56]  The effects in the United States must "occur[] as a direct and foreseeable result of the conduct outside the territory" and defendant "must know, or have good reason to know, that his conduct will have effects in the [forum] seeking to assert jurisdiction over him."[57]

be based on their individual contacts with the forum state."  *In re Alstom SA,* 406 F. Supp. 2d 346, 398 (S.D.N.Y. 2005) (citing *Charas v. Sand Tech. Sys. Int'l, Inc.*, No. 90 Civ. 5638, 1992 WL 296406, at *4-5 (S.D.N.Y. Oct. 7, 1992)).

[53]    *See Eskofot A/S v. E.I. Du Pont de Nemours & Co.,* 872 F. Supp. 81, 87 (S.D.N.Y. 1995) (citing *Unifund SAL,* 910 F.2d at 1033).

[54]    *Leasco*, 468 F.2d at 1341.

[55]    *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 295 (1980).

[56]    *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S.Ct. 2780, 2789 (2011).

[57]    *Leasco*, 468 F.2d at 1341.  *Accord id.* at 1341 & n.11 (activity in interstate commerce must be "sufficiently extensive and regular to make [the] possibility [of litigation in the United States] a foreseeable risk of the business").

## B.    Reasonableness

If the defendant's contacts with the forum state rise to this minimum level, the defendant may defeat jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[58]  Courts must weigh several factors in evaluating this "reasonableness" requirement of due process, including: "the burden on the defendant; the interests of the forum State and the plaintiff's interest in obtaining relief[;] 'the interstate judicial system's interest in obtaining the most efficient

---

Notably, the Second Circuit applied an even more stringent test in *In re Terrorist Attacks on September 11, 2001*, holding that "plaintiffs have the burden of showing that [defendants] engaged in 'intentional, and allegedly tortious, actions . . . expressly aimed' at residents of the United States."  538 F.3d 71, 95 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, — U.S. —, 130 S.Ct. 2278 (2010) (quoting *Calder*, 465 U.S. at 789).  However, while "express aim" is certainly sufficient to confer jurisdiction, it has not generally been found to be a requirement, particularly in the securities context.  *See, e.g.*, *SEC v. Straub*, No. 11 Civ. 9645, 2013 WL 466600, at *6 n.7 (S.D.N.Y. Feb. 8, 2013) ("[T]he Supreme Court has never suggested—whether in *Calder* or otherwise—that [express aim is] necessary for a Court to exercise jurisdiction.") (citing *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 455 n.34 (S.D.N.Y. 2005)).  Because I conclude that jurisdiction is lacking even under the less stringent test for jurisdiction, I need not determine whether the Second Circuit raised the bar in *In re Terrorist Attacks*.

[58]     *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.'"[59]

## IV.   This Court Lacks Personal Jurisdiction Over Steffen

Steffen argues that he lacks minimum contacts with the United States, and that the exercise of personal jurisdiction over him would be unreasonable.[60] Defendants dispute both assertions.[61]

### A.   Plaintiffs Have Not Established Minimum Contacts

The SEC's allegations are premised on Steffen's role in encouraging Regendantz to authorize bribes to Argentine officials that ultimately resulted in falsified SEC filings.  While Steffen's actions may have been a proximate cause of the false filings – and even that is a matter of some doubt – Steffen's actions are far too attenuated from the resulting harm to establish minimum contacts.  Steffen was brought into the alleged scheme based solely on his connections with Argentine officials.  In furtherance of his negotiations with those officials, Steffen "urged" and "pressured" Regendantz to make certain bribes.  However, Regendantz did not

---

[59]    *Asahi*, 480 U.S. at 113-14 (quoting *World-Wide Volkswagen*, 444 U.S. at 292).

[60]     *See* Def. Mem. at 3-4, 6-7.

[61]    *See* Opp. Mem. at 12, 14.

agree to make the bribes until he communicated with several "higher ups" whose responses he perceived to be instructions to make the bribes.[62]  Once Regendantz agreed to make the bribes – following receipt of instructions from Siemens' management rather than Steffen – Steffen's alleged role was tangential at best. Steffen did not actually authorize the bribes.  The SEC does not allege that he directed, ordered or even had awareness of the cover ups that occurred at SBS much less that he had any involvement in the falsification of SEC filings in furtherance of those cover ups.[63]  Nor is it alleged that his position as Group President of Siemens Transportation Systems would have made him aware of, let alone involved in falsification of these filings.

---

[62]    Thus, it is not even clear that Steffen's actions were a proximate cause of the bribes being made, given Regendantz's perceived need for approval from "higher ups."

[63]    *See* Compl. ¶¶ 47, 59 (noting that Regendantz instructed a subordinate to handle the paperwork related to the bribe payments and that Regendantz signed false quarterly and annual certifications, not Steffen).   Neither Sharef's call to Steffen from the United States nor the fact that a portion of the bribery payments were deposited in a New York bank provide sufficient evidence of conduct directed towards the United States to establish minimum contacts.  First, Steffen did not place the calls to Sharef.  Further, Steffen did not direct that the funds be routed through a New York bank.  *See id.* ¶ 44 (explaining the payment of the bribes was orchestrated by defendants Truppel, Signer, and Bock along with subordinates, but not by Steffen). His conduct was focused solely on ensuring the continuation of the Siemens contract in Argentina.

To be sure, there is ample (and growing) support in case law for the exercise of jurisdiction over individuals who played a role in falsifying or manipulating financial statements relied upon by U.S. investors in order to cover up illegal actions directed entirely at a foreign jurisdiction.[64]  In a recent decision, *SEC v. Elek Straub,* a court in this district exercised jurisdiction over individuals who orchestrated a bribery scheme aimed at the Macedonian government, *and* as part of the bribery scheme signed off on misleading management representations to the company's auditors and signed false SEC filings.[65]

As the SEC points out, the lynchpin of these decisions is that jurisdiction exists where "'an executive of a foreign securities issuer, wherever

---

[64]    *See, e.g.*, *SEC v. Stanard,* No. 06 Civ. 7736 (S.D.N.Y. May 16, 2007) (unpublished transcript of ruling, Opp. Ex. 1, Tr. 3: 15-18) (upholding jurisdiction over an executive of a foreign securities issuer who manipulated the reported earnings of a public company by engaging in sham reinsurance transactions and finding that he "specifically intended that his work would result in false statements by [his company]"); *In re Parmalat*, 376 F. Supp. 2d at 455 (holding that "if, as plaintiffs claim, [defendant] knowingly participated in the issuance of false financials and reports, she knew or had good reason to know that her actions would have effects here" based on intimate familiarity with the statutory filings of the company); *In re CINAR Corp. Securities Litigation*, 186 F. Supp. 2d 279, 306 (E.D.N.Y. 2002) (upholding jurisdiction over a Canadian general counsel, who had signed a fraudulent registration statement, holding that the act of signing the statement was a clear example of purposeful availment of the privilege of doing business within the United States).

[65]    *See Straub*, 2013 WL 466600, at *1-3, 10.   The court stated, "even if Defendants' alleged primary intent was not to cause a tangible injury in the United States, it was nonetheless their intent, which is sufficient to confer jurisdiction." *Id.* at *7.

located, participates in a fraud *directed* to deceiving United States shareholders.'"[66] It is by now well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies this test.[67] However, the exercise of jurisdiction over foreign defendants based on the effect of their conduct on SEC filings is in need of a limiting principle. If this Court were to hold that Steffen's support for the bribery scheme satisfied the minimum contacts analysis, even though he neither authorized the bribe, nor directed the cover up, much less played any role in the falsified filings, minimum contacts would be boundless. Illegal corporate action almost always requires cover ups, which to be successful must be reflected in financial statements. Thus, under the SEC's theory, *every* participant in illegal action taken by a foreign company subject to U.S. securities laws would be subject to the jurisdiction of U.S. courts no matter how attenuated

---

[66]    *See* SEC's Reply in Support of Its Notice of Supplemental Authority at 2 (quoting *Straub*, 2013 WL 466600, at *8 (quoting *Stanard*, No. 06 Civ. 7736)) (emphasis added).

[67]    By distinguishing these cases from the facts here, I do not intend to suggest that signing or directly manipulating financial statements is *necessary*. It is not necessary to draw that line because the allegations against Steffen are far more attenuated.

their connection with the falsified financial statements.   This would be akin to a tort-like foreseeability requirement, which has long been held to be insufficient.[68]

The allegations against Steffen fall far short of the requirement that he "follow[] a course of conduct directed at . . . the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."[69]   Absent any alleged role in the cover ups themselves, let alone any role in preparing false financial statements the exercise of jurisdiction here exceeds the limits of due process, as articulated by the Supreme Court and the Second Circuit.[70]

---

[68]     *See World-Wide Volkswagen*, 444 U.S. at 292;  *Leaseco*, 468 F.2d at 1341 (holding that "attaining the rather low floor of foreseeability necessary to support a finding of tort liability is not enough to support in personam jurisdiction").

[69]     *J. McIntyre Machinery, Ltd.*, 131 S.Ct. at 2789.  *See also Charas*, 1992 WL 296406, at *5 (finding jurisdiction lacking where defendant "neither entered the United States nor transacted any business in the United States[,] did not sign the registration statements at issue . . . [and] any fraudulent activities that Defendants may have committed in relation to [plaintiffs'] public offerings cannot reasonably be deemed the 'direct and foreseeable result' of the alleged failure of an outside director residing in Japan to monitor the Canadian corporation's affairs").  Although *Charas* involved an alleged failure to monitor, the contacts are similarly attenuated here where Steffen neither authorized the bribes, nor directed the cover ups, including but not limited to, manipulating financial statements.

[70]     *See*, *e.g.*, *Leasco*, 468 F.2d at 1341 n.11 (activity in interstate commerce must be "sufficiently extensive and regular to make [the] possibility [of litigation in the United States] a foreseeable risk of the business");  *In re Terrorist Attacks on September 11, 2001*, 538 F.3d at 95 (defendants must have "engaged in 'intentional, and allegedly tortious, actions . . . expressly aimed' at residents of the

19

### B.      Exercise of Jurisdiction Over Steffen Is Not Reasonable

The decision not to exercise jurisdiction in this case is bolstered by

my conclusion that requiring Steffen to defend this case in the United States would

be unreasonable.  If minimum contacts are present the defendant may defeat

jurisdiction only by presenting, "a compelling case that the presence of some other

considerations would render jurisdiction unreasonable."[71]  The reasonableness

analysis has been characterized as "largely academic" in cases brought under a

federal law which provides for nationwide service of due process.[72]  However,

when a defendant, is not located in the United States, "'[g]reat care and reserve

should be exercised when extending our notions of personal jurisdiction into the

international context.'"[73]

Steffen's lack of geographic ties to the United States, his age, his poor

proficiency in English, and the forum's diminished interest in adjudicating the

---

United States").

[71]      *Burger King Corp.,* 471 U.S. at 477.

[72]      *SEC v. Softpoint, Inc.,* No. 95 C. 2951, 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) (noting that the defendant presented no evidence that litigating in New York would significantly burden him); *but cf. Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 287 (S.D.N.Y. 2000) (stating that doubtless there will be defendants subject to national process who can show sufficient hardship to overcome even a strong federal interest).

[73]      *Asahi,* 480 U.S. at 115 (quoting *United States v. First Nat'l City Bank,* 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)).

matter, all weigh against personal jurisdiction.  Geographic ties alone do not dictate the extent of the reasonableness inquiry.[74]  However, it would be a heavy burden on this seventy-four year old defendant to journey to the United States to defend against this suit.  Further, the SEC and the Department of Justice have already obtained comprehensive remedies against Siemens[75] and Germany has resolved an action against Steffen individually.[76]  The SEC's interest in ensuring that this type of conduct does not go unpunished will not be furthered by continuing the suit against Steffen, in light of his age, the burden on him to defend this suit, and the previous adjudications.

## V.    CONCLUSION

For the reasons set forth above, Steffen's motion to dismiss for lack of personal jurisdiction is granted.  The Clerk of the Court is directed to close this motion  [Docket No. 23].

---

[74]    *See In re LDK Solar Sec. Litig.,* No. 07-CIV-5182, 2008 WL 4369987, at *7 (N.D. Cal. Sept. 24, 2008) ("If the reasonableness inquiry were dictated by the extent of defendants' geographic ties to the forum alone, the purposeful availment and purposeful direction inquiries would be meaningless.").

[75]    *See* Compl. ¶ 19.

[76]    *See* Reply Memorandum of Law in Support of Defendant Herbert Steffen's Motion to Dismiss the Complaint for Lack of Personal Jurisdiction and Failure to File Within the Statute of Limitations at 15.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           February 19, 2013

**- Appearances -**

**For Plaintiff:**

Denise Hansberry, Esq.
Kara Novaco Brockmeyer, Esq.
Paul W. Kisslinger, Esq.
Robert Irving Dodge, Esq.
Tracy Linkins Price, Esq.
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 942-4567

**For Defendants:**

Amanda Grier, Esq.
Erich T. Schwartz, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP (DC)
1440 New York Avenue N.W.
Washington, DC 20005
(202) 371-7691

Gary DiBianco, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
40 Bank Street Canary Wharf
London, EN E145DS
UK
44.20.7519.7258